**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-21164-CV-BLOOM /OTAZO-REYES**

CORA D. EUTSAY,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

THIS CAUSE is before the Court upon Plaintiff Cora D. Eutsay's ("Claimant") Motion for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 20] and Brief in Support of Motion for Summary Judgment (hereafter, "Summary Judgment Brief") [D.E. 20-1]; and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 23]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 16].[2] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. ___) are to the transcript pages rather than the court record pages.

## **PROCEDURAL HISTORY**

Claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI") on October 30, 2017, alleging a disability onset date of October 14, 2013. TR. 246. The application was denied initially and upon reconsideration. Id. at 74–133, 141–58. Upon Claimant's written request, a hearing was held on March 25, 2020, before Administrative Law Judge Theodore Burock ("ALJ Burock"), at which Claimant and Vocational Expert Michael Kibler ("VE Kibler") testified. Id. at 30, 42, 63.

On May 11, 2020, ALJ Burock issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2019. Id. at 20.

(2) Claimant had not engaged in substantial gainful activity since October 14, 2013, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.). Id.

(3) Claimant had the following severe impairments: Obesity, COPD/Asthma, Osteoarthritis of the hip and knee, and Lumbar Radiculitis (20 C.F.R. §§ 404.1520(c) and 416.920(c)). Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Id. at 24.[3]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), subject to additional limitations. Id.[4]

---

[3] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) and 416.925(a).

[4] The RFC is the ability of a claimant to do physical work activities on a sustained basis, despite the claimant's limitations or impairments. 20 C.F.R. § 416.945(a)(1). The RFC must be determined based on all the claimant's impairments, even those that are not considered "severe." See 20 C.F.R. §§ 416.920 and 416.945.

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a).

(6) Claimant was able to perform her past relevant work as an employment and claims aide, government services. (20 C.F.R. §§ 404.1565 and 416.965). Id. at 30.[5]

(7) Claimant had not been under a disability, as defined in the Social Security Act, from October 14, 2013, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)). Id. at 31.

On January 28, 2021, the Appeals Council denied a request for review of ALJ Burock's Unfavorable Decision. Id. at 1–7. On March 26, 2021, pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Claimant filed this action, seeking reversal of ALJ Burock's final administrative decision [D.E. 1].

In support of her contention that ALJ Burock's Unfavorable Decision should be reversed, Claimant argues that:

I.     The ALJ's finding that Claimant was able to perform her past relevant work is not supported by substantial evidence.

II.    Claimant is entitled to a rehearing because the ALJ's decision is constitutionally defective.

See Claimant's Summary Judgment Brief [D.E. 20-1]. The undersigned finds no merit in either of these contentions.

## RELEVANT MEDICAL EVIDENCE

### A. Treating Sources

### 1) North Shore Medical Center ("North Shore")

In January 2015, Claimant was admitted to North Shore for asthma with acute exacerbation and underwent a depression screening upon admittance. TR. at 1906. Claimant's depressive

---

[5] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

screening was negative with no reported feelings of depression or thought of suicide in recent weeks.  Id.

On April 8, 2018, Claimant was again admitted to North Shore for acute asthma exacerbation and underwent a series of health screens, including a urine toxicology screening that was positive for opiates and oxycodone.  Id. at 1837. Claimant complained of feeling anxious and having increased stress due to a recent death in the family but did not report problems sleeping. Id.  at 1517, 1856. Her past medical history for polysubstance abuse was noted. Id. at 1514, 1839. Claimant presented with an overall normal psychiatric presentation.  Id.

On December 26, 2019, Claimant visited North Shore for additional treatment due to acute asthma exacerbation.  Id. at 4181, 4253.  During her medical evaluation, Claimant presented as cooperative with an appropriate mood and affect, and normal judgment.  Id.  Claimant's thought process was coherent, her attention span was attentive, and she denied experiencing any neurological problems.  Id. at 4181.

On January 6, 2020, Claimant visited North Shore for additional treatment due to shortness of breath.  During her medical evaluation, Claimant presented as cooperative with an appropriate mood and affect, exhibited normal judgment and speech, and was alert and oriented with no focal neurological deficit observed.  Id. at 4547.

### 2)  Jackson Memorial Hospital ("Jackson Memorial")

On January 24, 2017, Claimant visited Jackson Memorial for depression related to the loss of several family members, including her mother, father, and nephews as well as the loss of her freedom due to a recent prison term.  TR. at 855.  She stated that her anti-depression medications were only helping with sleep but were otherwise not helpful.  Id.  She presented with obesity and

hypertension and was counseled regarding weight loss and prescribed different anti-depressant medications.  Id.

On April 24, 2018, Claimant visited Jackson Memorial complaining of shortness of breath due in part to anxiety caused by the anniversary of her late-husband's death and recent death of her mother-in-law.  Id. at 2449.  Claimant's medical history of depression, insomnia, and long-time nicotine addiction were noted as ongoing.  Id.  Claimant denied substance and alcohol abuse. Id.

### 3)   University Medical Health Center ("University Medical")

On March 19, 2018, Claimant visited University Medical for an initial consultation due in part to mental health problems, including feelings of depression, anxiety, difficulty falling asleep, lack of energy, nightmares, and crying spells.  TR. at 1470.  Claimant reported that her symptoms began upon the death of her mother in 2008.  Id.  She denied prior hospitalizations or out-patient psychotherapy for treatment of depression, but stated she had started receiving counseling one week prior to her visit.  Id.  Upon examination, Claimant presented as conscious, alert, coherent, and cooperative with her memory and judgment intact.  Id. at 1472. Claimant's neurological examination was normal.  Id. at 1474.

### 4)   Jose Nadine Garcon, Psy.D. ("Dr. Garcon") and Dayana Gonzalez, Psy.D. ("Dr. Gonzalez")

On March 21, 2018, Claimant visited Dr. Garcon and Dr. Gonzalez for a consultative mental status evaluation.  TR. at 1478.  Dr. Garcon and Dr. Gonzalez noted Claimant's reported history of mental health symptoms since her mother's death in 2008 and her history of domestic violence during her childhood and in her prior marriage with her husband, whom she divorced in 2017.  Id. at 1478–79.  Claimant complained of memory impairment, low concentration, angry outbursts, and psychological distress ever since she was released from prison in 2017.  Id. at 1479.

Claimant was indicted in 2015 after being accused of fraud at her place of employment; she was sentenced to 2 years, but only spent 13 months in prison and 7 months in a halfway home. Id. She stated she had been "'wrongly'" accused of fraud and had lost her 28-year job with South Florida Workforce. Id. Claimant was on probation at the time she visited Dr. Garcon and Dr. Gonzalez and reported that she preferred to spend all of her time at home to avoid any "'problems'" and considered her children, aunt, and her best friend as her social support; she also reported that she was able to establish and maintain friendships. Id.

Claimant complained of anxiety with fears of going back to prison, and a decreased appetite with a 90-pound weight loss since her release from prison. Id. at 1480. Claimant weighed 210 pounds at the time of her visit and measured 5'7; she presented as cooperative with good hygiene and good eye contact. Id. at 1479. Claimant reported smoking one pack of cigarettes per day, every 2-3 days. Id. at 1480. She denied having any suicidal thoughts but presented with a sad mood and a depressed affect and reported having trouble sleeping and experiencing nightmares. Id.

Upon observation, she was able to sustain attention and presented with average intellectual abilities. Id. Her insight, judgment, and impulse control were within normal limits during the evaluation; her though process was goal directed and logical; and her thought content was congruent to discussions. Id. Claimant reported hearing auditory hallucinations, such as hearing voices of deceased family members, but no overt symptoms of psychosis were observed during the evaluation. Id. Claimant followed a logical and sequential order when providing background information and her short-term memory was satisfactory. Id. Claimant was also able to satisfactorily complete mental calculations; exhibited good social reasoning; and her deductive reasoning was satisfactory. Id. As to her daily living skills, Claimant reported that she could bathe

and dress herself, go shopping, and manage her finances.  Id.  1480–81.  She reported an ability to drive but lacked a valid driver's license; and that she spent a typical day watching TV.  Id. at 1480.

Dr. Garcon and Dr. Gonzalez diagnosed Claimant with an adjustment disorder, with mixed anxiety and depressed mood, and determined that Claimant's reported mental health symptoms, such as avoiding social contact, nightmares, and flashbacks, related to her time in prison appeared transient and that they could be reduced once she became fully reintegrated into the community. Id. at 1480–81.  Dr. Garcon and Dr. Gonzalez concluded that assistance from the Disability Office based on cognitive impairment did not appear to be strongly substantiated and that her emotional impairment would improve with a sufficient adjustment period to community living after her incarceration.  Id. at 1481. Both doctors recommended that she continue with psychiatric and psychological services and participate in a vocational program to reintegrate back into the workforce.  Id.

### 5)  Total Orthopaedic Care ("Total Orthopaedic")

On January 18, 2019, Claimant visited Total Orthopaedic for hip and knee pain.  TR. at 3880.  With respect to her mental health status, Claimant presented as oriented with an appropriate mood and affect.  Id. at 3881.  She reported that she was "'working on her weight'" with a prior weight of 300 pounds down to 213 pounds; she denied any unplanned weight loss, loss of appetite, or fatigue.  Id. at 3880–81.  She also denied any depression or sleep disorder.  Id.

### 6)  New Horizon Mental Health ("New Horizon")

On June 10, 2019, Claimant visited New Horizon for an outpatient mental health assessment, after being referred for services by her probation officer, and was seen by Social Worker Janice Price ("Ms. Price").  TR. at 3906, 3918.  Claimant reported crying frequently, feeling tired and sad, experiencing hallucinations, and having difficulty sleeping.  Id. at 3906.

Claimant told Ms. Price that she was being stalked and harassed by her husband's mistress and that she had shot at both of them and had engaged in a physical altercation with her husband's mistress.  Id. at 3918.   She reported that had she received a jail sentence for aggravated assault as a result and had been released from prison in December 2018.  Id.  Claimant reported a history of depression and physical abuse from her father starting at age 2 and continuing throughout her adult life during her marriage.  Id. at 3908.  Claimant reported feeling depressed after the death of her mother in 2008 and that she felt she "'lost everything'" due to her criminal charges; Claimant reported that her support system consisted of her children and family.  Id.  at 3918.  Ms. Price noted Claimant's reported hallucinations in addition to her impaired memory and inconsistent insight and judgment.  Id. at 3906–07.  She found Claimant presented with a depressed mood but with a full range affect, a cooperative attitude, and a rational thought process.  Id.  Ms. Price diagnosed Claimant with major depressive disorder, recurrent severe with psychotic features and referred Claimant for psychiatric services and therapy.  Id. at 3917–18.

On October 25, 2019, Claimant visited New Horizon for follow-up and was examined by Liana Mendoza, MD ("Dr. Mendoza").  Claimant presented with a depressed mood but otherwise had a normal mental presentation.  Id. at 3903–04.  Dr. Mendoza found Claimant presented as cooperative, her thought process, memory, and speech were unremarkable, she had an appropriate affect, and her insight and judgment were fair.  Id. at 3903.  Claimant denied any suicidal or homicidal ideations.  Id.

### B.  Non-treating Sources

#### 1)  State Agency Psychological Consultant Janet Anguas-Keiter, Psy.D. ("Dr. Anguas-Keiter")

On April 5, 2018, Dr. Anguas-Keiter completed a mental status examination for Claimant for purposes of a disability determination.  TR. at 74.  Dr. Anguas-Keiter found that Claimant had

no severe mental health impairments, and no more than mild limitations with maintaining concentration, persistence, or pace.  Id. at 79–80.  Dr. Anguas-Keiter noted that Claimant was released from federal prison in 2017 for selling names, date of births, and social security numbers from a secure state system, and that she reported feeling depressed at that time due to family loss and time spent incarcerated.  Id. at 80.  At the evaluation, Claimant reported having understanding and memory limitations, problems concentrating, and limitations interacting socially.  Id. at 81. However, Dr. Anguas-Keiter determined that Claimant's statements were only partially consistent with her total medical and non-medical evidence on file and that, overall, her statements were more severe than what was shown in her medical evidence of record.  Id. at 81.  Dr. Anguas-Keiter also noted that Claimant's reported March 2018 evaluation showed that she presented with an overall intact mental status with good memory and judgment and that her daily activities indicated adequate mental health functioning.  Id. at 80, 92.  Dr. Anguas-Keiter concluded that Claimant was "'not disabled'" given her age, education, and RFC.  Id. at 83–84, 96.

### 2)   Madelyn Miranda-DeCollibus, Psy.D. ("Dr. Miranda DeCollibus")

On July 20, 2018, Dr. Miranda-DeCollibus completed a Psychological RFC Assessment for Claimant on reconsideration.  TR. at 103–09.  Claimant reported that her psychological condition had not worsened.  Id. at 108, 122.  Upon review of the evidence submitted on reconsideration, Dr. Miranda-DeCollibus noted Claimant's release from prison in July 2017 for charges related to selling personal information from the state's secure system and also noted Claimant's reported depression due to family loss and prison.  Id. at 108–09, 123.  Dr. Miranda-DeCollibus further noted that Claimant's March 2018 evaluation showed that she presented with an overall intact mental status with good memory and judgment, with her daily activities indicating adequate mental health status.  Id. at 123–26.  Dr. Miranda-DeCollibus determined that the April

5, 2018, assessment by Dr. Anguas-Keiter was consistent with and supported by the medical evidence of record, and that Claimant's "Depressive, Bipolar, and Related Disorders" were non-severe. Id. at 108, 121. Dr. Miranda-DeCollibus affirmed the prior conclusion that the Claimant was "'not disabled.'" Id. at 126.

## HEARING TESTIMONY

A hearing was held on March 25, 2020, before ALJ Burock, at which Claimant and VE Kibler testified. TR. at 40.

### I.   Claimant

Claimant testified that she weighed 209 pounds but that her normal weight was 280 and that she had experienced weight loss from what she felt was due to depression. TR. at 45–46. She testified that she had been living with her daughter for the past three years and was divorced; she did not have any income of her own since 2014 and relied on food stamps. Id. at 46–47. She reportedly stopped working due to ongoing back problems; however, when questioned by ALJ Burock about her testimony in her consultative exam that she had stopped working due to being fired for criminal activity, Claimant agreed that that was the initial reason she stopped working but added that, even if she had not been fired, she would not have been physically able to continue working. Id. at 47–48. She testified that she was convicted of identity theft and spent 13 months in federal prison followed by 7 months in a halfway house; and that she was still on probation at the time of the hearing. Id. at 48.

Claimant testified that she had suffered from acute asthma since the age of two; had experienced orthopedic problems in several her joints; and was taking prescription medication to manage the pain. Id. at 50–51. Claimant also testified to feeling "very" depressed because she didn't have her home, and often cried and avoided going outside because she wanted to be left

alone.  Id. at 51–52.  She testified that she took medication to manage her depression but that it made her feel nauseous and dizzy.  Id. at 52.  At the time of the hearing, Claimant had been receiving ongoing counseling at New Horizons for roughly six months; prior to that, Claimant had received court-appointed counseling under a different counselor for two years after getting out of prison.  Id. at 52–53.  Claimant stated that the counseling was not helping her feelings of depression.  Id. at 53.  Claimant also testified that she was having memory problems, including not remembering how to get home and not remembering the days of the week.  Id. at 54.  When asked how she was sleeping, Claimant stated she had insomnia.  Id.  Claimant further testified that she spent most of the day sitting and looking out of the window and watched some television.  Id. at 55.

On examination by her attorney, Claimant stated that she was unable to sleep due to feeling depressed about her physical health, specifically, her constant joint pain and limited mobility.  Id. at 58.  She testified that she was unable to nap during the day and that she felt as though she "lost everything" because she could no longer partake in the hobbies she once enjoyed, such as dancing, running, and playing tennis.  Id. at 59–60.  She testified that she had enjoyed working and helping the community by feeding the homeless, but that was no longer able to do either because she "fell and injured" herself.  Id. at 61.

On re-examination by ALJ Burock, Claimant testified that her disability onset date started in October 2014 rather than October 2013 as she had initially indicated in her application for supplemental security income.  Compare id. at 62 with id. at 246.  Claimant also testified that she had applied for disability before she was fired from her job as a claims aide in government services.  Id. at 62.  Claimant testified that she was a supervisor for two years in her job as a government

services' claims aide before she was fired and that she did not have hiring or firing authority in

that role.  Id. at 64.

## II.    VE Kibler

VE Kibler classified Claimant's prior work as follows:

> ➢ Employment and claims aide – government services, DOT #169.367-010,[6] with an exertional level of sedentary[7] (but based on Claimant's testimony, she probably performed it at a "heavy" exertional level) and a Specific Vocational Preparation (hereafter, "SVP") of 5, with an SVP of 6 for the supervisory work.[8]

Id. at 64.

ALJ Burock posed to VE Kibler three hypotheticals for an individual of Claimant's age,

with her education and work experience who:

1) Had an RFC for light work, with no concentrated exposure to extreme cold or heat, fumes, odors, dust, gases, or poor ventilation.  (Hypothetical No. 1).

2) Had an RFC for sedentary work with the same environmental restrictions as in Hypothetical 1.  (Hypothetical No. 2).

3) Had an RFC for light work, with the same environmental restrictions as in Hypothetical 1, plus routine, repetitive tasks. (Hypothetical No. 3).

---

[6] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities and defines the structure and content of all listed occupations.   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).  "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do heavy work, we determine that he or she can do sedentary and light work."  20 C.F.R. § 404.1567(d).

[8] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 5 means that preparation for the job should take "[o]ver 6 months up to and including 1 year".
An SVP of 6 means that preparation for the job should take "[o]ver 1 year up to and including 2 years".
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Id. at 66–68.

VE Kibler testified that the individual in Hypothetical Nos. 1 and 2 would be able to perform Claimant's past work as classified, but not as performed.  Id. at 61.  VE Kibler further testified that the individual in Hypothetical No. 3 could perform the following jobs:

> ➢ Housekeeping/cleaner, DOT # 323.687-014, with an exertional level of light and an SVP of 2, with approximately 78,000 jobs in the national economy.

> ➢ Office helper, DOT # 239.367-010, with an exertional level of light and an SVP of 2, with approximately 45,000 positions in the national economy.

> ➢ Garment folder, DOT # 789.687-066, with an exertional level of light and an SVP of 2, with approximately 15,500 positions in the national economy.

Id. at 66-67.

Claimant's attorney then asked VE Kibler if, when answering ALJ Burock's hypotheticals, she had reviewed any factors other than the ones listed in ALJ Burock's hypotheticals.  Id. at 69. VE Kibler responded that he had not considered any other factors outside of ALJ Burock's hypotheticals.  Id.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed

valid." <u>Williams</u>, 416 F. App'x at 862.

<u>**REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS**</u>

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Burock determined that Claimant had not engaged in SGA since October 14, 2013, the alleged onset date.  TR. 20, 31.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  <u>Phillips</u>, 357 F.3d at 1237.  In this case, ALJ Burock found that Claimant suffered from the following severe impairments: obesity; COPD/asthma; osteoarthritis of the hip and knee; and lumbar radiculitis.  TR. 20. He found Claimant's mental impairments were not severe because they caused no more than "minimal limitation in [Claimant's] ability to perform basic mental work activities".  <u>Id.</u> at 20–23.  ALJ Burock then proceeded to step three. <u>Id.</u>

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  <u>Phillips</u>, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  <u>Id.</u>  Here, ALJ Burock determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 24.  Therefore, ALJ Burock proceeded to step four.  <u>Id.</u>

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." <u>Phillips</u>, 357 F.3d at 1238.  As to the first prong, ALJ Burcok determined that Claimant had the RFC to:

> Perform sedentary work as defined in CFR 404.1567(a) and 416.967(a) except with no concentrated exposure to extreme cold or heat, fumes, odors, gases, and poor ventilation.

TR. 24.  Based on Claimant's RFC, ALJ Burock moved to prong two of step four and concluded that Claimant was able to perform her past relevant work as an employment and claims aide, government services; and that such work did not require the performance of work-related activities precluded by Claimant's RFC.  <u>Id.</u> at 30.  Thus, ALJ Burock concluded that Claimant was not under a disability, as defined in the Social Security Act, from October 14, 2013, through the date of the Unfavorable Decision and the sequential evaluation process ended at step four.  <u>Id.</u> at 30–31.[9]

## <u>DISCUSSION</u>

As noted above, Claimant argues that:

I.    The ALJ's finding that Claimant was able to perform her past relevant work is not supported by substantial evidence because he failed to consider Claimant's mild mental limitations.

II.    Claimant is entitled to a rehearing because the ALJ's decision is constitutionally defective.

<u>See</u> Claimant's Motion for Summary Judgment [D.E. 20-1].  The undersigned finds no merit in either of these contentions.

---

[9] Here, ALJ Burock did not proceed to the fifth step because he determined that Claimant was able to perform her past relevant work.  TR. at 30–31.  At the fifth step, the ALJ would have had to show that Claimant has the ability to perform work that is available in significant numbers in the national economy, considering her RFC, age, education, and work experience.  <u>Phillips</u>, 357 F.3d at 1239–4; 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(1), (4)(i)(v).

**I.        Ability to Perform Past Relevant Work**

Claimant first argues that the ALJ's determination that Claimant could perform her past relevant work was not supported by substantial evidence because he failed to consider her mild mental limitations.  See Claimant's Motion for Summary Judgment [D.E. 20-1 at 3–5].[10]  The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence because at step two of the sequential disability evaluation, the ALJ found that Claimant did not have a severe mental impairment, which in turn, "did not obligate him to include mental limitations in the RFC finding."  See Commissioner's Motion for Summary Judgment [D.E. 23 at 5–6].

"An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities."  Chereza v. Comm'r, 379 F. App'x 934, 940 (11th Cir. 2010) (citing 20 C.F.R. § 404.1521(a); Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997)).[11]  ALJs rate the degree of a claimant's mental ability limitations by conducting an analysis of four broad functional areas known as the "paragraph B" criteria, namely: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.   20 C.F.R. §§ 4040.1520a(c)(3), 416.920a(c)(3).   If the ALJ rates "the degrees of [a claimant's] as 'none' or 'mild', [the Commissioner] will generally conclude that [claimant's] impairment(s) is not severe, unless the

[10] Claimant did not challenge ALJ Burock's RFC finding with regard to physical limitations.  See Claimant's Motion for Summary Judgment [D.E. 20-1 at 3–8].  Accordingly, any such objection is deemed abandoned.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F. 3d 680-81 (11th Cir. 2014) (a party abandons an issue that it does not plainly or prominently raise or where the party only makes passing reference to the issue).

[11] "Basic Work Activities" is defined as "the abilities and aptitudes necessary to do most jobs.  Examples of these include – (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).

evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities". 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).  As discussed below, ALJ Burock found no more than mild limitations in all four functional areas.

First, ALJ Burock determined that Claimant's March 2018 evaluation with Dr. Gonzalez and Dr. Garcon showed that she presented with "satisfactory memory, with the ability to follow a simple 3-step command, and a good ability to follow more cognitively complex commands", including performing mental calculations.  TR. at 23, 1480.  ALJ Burock also noted that, despite Claimant testifying at her hearing that she had impaired memory to the extent that she got lost when driving, she stated at her medical evaluation that she could drive but did not have a valid driver's license.  Id.  Thus, ALJ Burock found no limitations in this area.

Next, ALJ Burock found that Claimant had only a mild limitation in interacting with others. Id.  ALJ Burock compared Claimant's testimony that she did not leave home with her statements at her March 2018 medical evaluation that she preferred to spend her time at home to avoid any "'problems'" while on probation as opposed to any specific mental health symptoms.  Id. at 23, 1479.  ALJ Burock also noted that Claimant reported that she wass able to establish and maintain friendships and had her children, aunt, and best friend as her support system.  Id.

ALJ Burock further determined that Claimant had mild limitations in concentrating, persisting, or maintaining pace.  Id. at 23.  ALJ Burock noted discrepancies between claims of difficulty concentrating and performing tasks with the results from Claimant's medical evaluation that showed she had good concentration, the ability to sustain attention, and normal thought processes.  Id. at 23, 1480.

Finally, ALJ Burock determined that Claimant had a mild limitation in adapting or managing herself based on his review of her self-reporting, consultative medical evaluation, and

medical history.  Id. at 23.  ALJ Burock noted that the record indicated that Claimant presented with no concerns regarding her hygiene and was found to be present with normal judgment and thought content with no history of inpatient psychiatric treatment.  Id.

Based on his analysis of these four broad functional areas, ALJ Burock determined at steps 2 and 3 of the sequential evaluation process that Claimant's medically determinable mental impairments did not limit Claimant's ability to perform basic work activities, thus, her mental impairments were non-severe.  Id.  Thus, ALJ Burock was not obligated to include mental limitations in his RFC finding of Claimant.  See Williams v. Soc. Sec. Admin., 661 F. App'x 977, 980 (11th Cir. 2016) (ALJ did not err in his decision to omit claimant's depression from the RFC assessment where it caused no more than mild limitations); Sprague v. Colvin, No. 8:13-CV-576-T-TGW, 2014 WL 2579629, at *6 (M.D. Fla. June 9, 2014) (finding RFC that omitted mental limitations was supported by substantial evidence where ALJ found that claimant had no more than mild limitations in any of the paragraph B functional areas); Bradley v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) (an impairment is not severe if "it has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work").

Therefore, there is no error in ALJ Burock's determination that Claimant's mental impairments were non-severe, and his mental RFC assessment that Claimant can perform her past relevant work is supported by substantial evidence.  See Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) ("Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.").

II.      **The constitutionality of the ALJ's decision**

Plaintiff argues that ALJ Burock's decision denying her disability benefits claim is constitutionally defective because former Commissioner of Social Security, Andrew Saul, had no constitutional authority to delegate the case to the ALJ, and thus, ALJ Burock had no authority to hear the case.  See Claimant's Motion for Summary Judgment [D.E. 20-1 at 8–9].  Claimant also contends that she was deprived of "a valid administrative adjudicatory process" because the Commissioner's authority was derived from 42 U.S.C. § 902(a)(3) of the Social Security Act, which Claimant argues violates separation of powers by limiting the President's authority to remove the Commissioner of Social Security without good cause.  Id. at 9.

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause.  See Commissioner's Motion for Summary Judgment [D.E. 23 at 8–9] (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OCL Op.")).  However, the Commissioner argues that Claimant has not and cannot show that Section 902(a)(3)'s removal restriction affected the determination of her claim in any way, and thus, it's unlawfulness does not support setting aside her unfavorable decision.  Id. at 9.

In Collins v. Yellen, 141 S. Ct. 1761, 1787–89 (2021), the Supreme Court reviewed a constitutional challenge similar to the one in this case, in which the claimant challenged the leadership structure of the Federal Housing Finance Agency ("FHFA") as unconstitutional because its sole director was removable only for cause.  Id. at 1787.  The Supreme Court found that the FHFA's removal restriction violated constitutional separation of powers by limiting the President's authority to remove executive branch officers.  See id. (explaining that "the Constitution prohibits

even 'modest restrictions' on the President's power to remove the head of an agency with a single top officer") (internal citation omitted). However, the Supreme Court ruled that, even where an unconstitutional statutory provision is present, a claimant cannot obtain relief without showing that the "unconstitutional provision . . . inflict[ed] compensable harm."  Id. at 1789.  In his concurrence, Justice Thomas further explained that with "removal-restriction cases", "[t]he Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract" and that "[t]he mere existence of an unconstitutional removal provision . . . generally does not automatically taint Government action by an official unlawfully insulated."  Id. at 1790 (Thomas, J., concurring).  Instead, a claimant "must show that the challenged Government action at issue . . . was, in fact, unlawful."  Id.

Here, Claimant has not shown how Section 902(a)(3)'s removal restriction "inflict[ed] compensable harm" on her or how it affected the determination of her claim in any way.  Thus, under Collins, Claimant is not entitled to a rehearing on separation of powers grounds.  Moreover, Claimant overlooks that ALJ Burock's appointment was not ratified by former Commissioner Andrew Saul, but was instead ratified on July 16, 2018 by then-Acting Commissioner Nancy Berryhill, who served as the Acting Commissioner from January 2017 until June 2019.  See Social Security Ruling 19-1p; see also SOCIAL SECURITY HISTORY, ssa.gov/history/berryhill.html.  As the Acting Commissioner, Ms. Berryhill did not have statutory tenure protection, and thus, could have been removed at will at any time.  See 42 U.S.C. 902(b)(4); see also Boger v. Kijakazi, No. 1:20-cv-00331, 2021 WL 5023141, at * 3 n.4 (W.D.N.C. Oct. 28, 2021) ("Indeed, Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because ALJ Howard was appointed by an Acting Commissioner of Social Security who could be removed from that office at the President's discretion.") (emphasis in original).  Thus, Section 902(a)(3)'s

removal restriction was inapplicable to Acting Commissioner Berryhill and by extension, to ALJ Burock. Therefore, Claimant's separation of powers argument has no merit, and Claimant is not entitled to a rehearing.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 20] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 23] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom, United States District Judge. Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 4th day of May, 2022.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Beth Bloom
       Counsel of Record